THE TOWN OF BOONTON

*v.*

UNITED WATER SUPPLY COMPANY et al.

[Decided October 27th, 1917.]

1. Under the contract involved in this case, it is *held*, that if the complainant takes anything under its option to purchase, it must take all of the plant of the defendant company.

2. Under the evidence in this case, *held* that the vote of the people authorizing the purchase was to purchase the system as it was, and not as it ought to be.

On bill, &c.

Mr. *Frank H. Pierce,* Mr. *Kinsley Twining* and Mr. *Richard V. Lindabury,* for the complainant.

Mr. *James V. Beam,* Mr. *Thomas J. Hillery* and Mr. *Elmer King,* for the defendants.

STEVENS, V. C.

This is a suit for the specific performance of a contract made in 1893, between Lewis Van Duyne, the Boonton Water Company and the mayor and common council of the town of Boonton. Lewis Van Duyne agreed to transfer to the water company certain water rights which he controlled in Brook Valley, and the water company, on its part, agreed to procure for and furnish to the town, in two years from its date, a full, ample and sufficient supply of water, viz., five hundred thousand gallons per day, to be increased to one million gallons if necessary.

By paragraph 11 of the contract the town had the right to purchase the plant with its extensions at the expiration of twelve years, and if it did not, the further right to purchase it at the expiration of ten years thereafter. The town now wishes to avail itself of this latter option.

The contract provides for the ascertainment of the price, first, on the basis of net income, and secondly, if the net income be not sufficiently large to give a principal sum greater than cost, then on the basis of cost. It is conceded that the price must be ascertained on the basis of cost.

By paragraphs 9 and 10 of the contract it is provided that the water company

"shall keep an accurate account to be verified by the proper receipts and vouchers, maps and plans, of all moneys to be expended by them in and about the construction and completion."

of the plant and of its enlargement and extension. This neither the original company, which became insolvent, nor its successor, the present defendant, did.

Two questions were discussed on the argument—*first,* what is the "plant" within the meaning of the contract, and *second,* what must the town pay.

Speaking very generally, the first question has arisen in this wise: The water company laid, among its extensions, a considerable number of one-inch pipes; and, in order to get a better head of water, erected a standpipe. The theory of the town council, and the theory of the bill filed, seems to be that the town is entitled to take them without paying for them. It is entitled to take them because they are a part of the plant. It is not obliged to pay for them because they were not laid or their price ascertained in the manner required by the contract. The contention on the hearing was somewhat different. It was, that they were not a proper part of a well-constructed system, and that, therefore, as they never received formal approval, the town was not, under the contract, obliged either to take or to pay for them. If this latter position be sustained, many of the persons who now get a water supply will be shut off until new pipes are laid or until the old ones or their use are acquired by bargain or condemnation.

The claim in the bill to take without paying is so inequitable that it may be dismissed in a few words. Such cases as *Hackettstown* v. *Swackhamer, 37 N. J. Law 191,* are inapplicable, for the reason that the town is not defending itself against a

claim which has no legal basis of support, but is asking the court to give it that which it is under no compulsion to take. He who asks equity must do equity. It need not take anything; what it takes it must pay for. I do not speak now of pipes that have been abandoned. They will be considered later.

The real question is, What must the town take if it take at all? Must it take the system as it finds it or may it take that part only which was sanctioned by the town council?

I think the town if it take anything must take the whole. The bill, after alleging that the defendant company had erected a standpipe and had made various other extensions and enlargements without complainant's approval or consent, and that their cost had not been ascertained and stated as required by the contract, charged as follows:

"Complainant charges that the pipe, mains and equipment constituting the Wilson street and Vreeland avenue extension, * * * *together with the standpipe, pumping station and other pipes and equipment thereon,* and all mains, pipes or equipment connected therewith, as well as all and singular the machinery, outfit, pipes, pipe lines, valves, mains and equipment of the * * * company, whether located upon or under premises hereinbefore particularly described or upon or under public highways * * * in locations unknown to complainant or located elsewhere, constitute a portion of the said water-supply plant or system of the said United Water Supply Company."

The prayer is that the company convey its rights of way, lands,

"and all and singular its machinery, outfit, pipes, mains * * * pumping station, standpipe, * * * *plant, machinery, fixtures or property of any and every kind for use in connection with the service or supply of water.*"

The bill is in strict accordance with the prior action of the town. On November 2d, 1914, the town council passed a resolution which provided as follows:

"Resolved that in the judgment of the town council, it is deemed advisable to purchase the water works system or plant for supplying the inhabitants of said town with a supply of pure and wholesome water," &c.

It was further resolved that the question of purchase for a price not exceeding $175,000 should be submitted to the voters, at a special election to be held pursuant to the provisions of the act of 1914 (*P. L. 1914 p. 482*), a supplement to the act of 1899. *P. L. 1899 p. 226.*

In order that the inhabitants might vote intelligently, the council had, in August, 1914, appointed two engineers—Mr. Potts and Mr. Van Duyne—to value the plant and to make an estimate of the extensions and enlargements. This they did. They reported on October 7th, 1914, and estimated upon everything that then formed part of the system, including the standpipe and its connections and the one and two-inch pipe.

The notice of special election directed to be given by the town council submitted the question in form following: "In favor of the purchase of water works system according to resolution of council;" "against the purchase of water works system," &c. The voters having voted in the affirmative, the council, on December 7th, 1914, directed a notice to be served upon the water company, to the effect that they wished to purchase the "water supply plant with its enlargements and extensions *now operated by the water-supply company.*"

It thus appears that what the council resolved to acquire, and what the voters voted to acquire, and what the bill prayed for, was the system as it is.

The cases of *Gillen* v. *Spring Lake, 61 N. J. Law 392*, and *Wilson* v. *Collingswood, 80 N. J. Law 626; 81 N. J. Law 634*, are very much in point. They hold that no legal assent can be given to a system of public works until it be formulated and presented to the people for acceptance. It is said that upon the tank or standpipe system there are ninety-five taps or house connections, and upon the pipe lines whose pipes are less than four inches in diameter one hundred and eighty-two taps; that is, two hundred and seventy-seven taps out of a total of seven hundred and eighty taps for the entire town. The system brought before the voters was the system as it then was, not as it ought to have been had contract requirements been observed. It was for the system in actual use that the affirmative vote was given. What the vote would have been had it been declared that a large

percentage of the householders using water would, at least for the time being, be excluded from the benefit of the water-supply, no one knows. The vote of the town accords with the principles of equity. As the system is one whole it ought to be taken as one whole, if at all. While the town did not formally sanction pipes less than four inches in diameter, it never formally objected to them. It is highly probable that in some instances, at least, it would have approved them. The company from the start suffered from lack of funds. The original agreement stipulated for water at rates much below those ordinarily charged. The first company failed. After foreclosure the Scranton management which had acquired the plant, soon gave up the undertaking. It came again into the hands of Mr. Conover and others who had organized it. The new company, like the old, was hampered for want of funds, and most of the extensions were made only after solicitation by applicants who needed water and were in the first instance willing to advance the cost of its introduction. The contract does not call for pipe of any particular size. It only requires that it be of *proper* caliber. It is obvious that in the case of a street just opened, with only two or three houses upon it, one-inch pipe would, at least, temporarily, suffice. When the street was built up a larger pipe would be needed. That illustrates the situation. It is quite likely that had a joint request been made by the applicant and the company to approve the laying of a one or two-inch pipe in such a street, the application would not have been rejected. Such a pipe would have been *proper* in view of the then situation. To hold that a very considerable portion of the system should be excluded because not laid and approved in strict accordance with the provisions of the contract would inflict an injury that the town and its voters did not vote to inflict—an injury hurtful alike to the company and to many of the householders who for the time being might lose their supply.

The pipe that I have been considering is pipe in use. To the pipe not in use different considerations apply.

The fourth section of the contract provides that the party of the second part

"shall erect, build, lay down and complete and properly furnish all necessary water mains, dam or dams, reservoir or reservoirs and pipes and other apparatus and appurtenances as may be required therefor as shown on city plan and specifications," &c.

The mains and pipes are to be of "cast and wrought iron of proper strength and caliber," and the supply of water is to be furnished "to all the inhabitants of the town along the lines of the water mains who may apply therefor." (Section 3.)

The ninth section provides that the water company shall keep accurate accounts to be verified by the proper receipts and vouchers up to the time the water shall be in readiness for delivery; the account is to be examined and the cost ascertained and stated in writing "by any person or persons to be appointed therefor" by the town.

The tenth section reads as follows:

"Tenth. That the cost of any enlargement or extension of said water-supply plant by any enlargement or extension of pipes, mains, dams or reservoirs, made by the party of the second part, *with the approval and consent* to be manifested by resolution or resolutions of the said party of the third part (the town) at any time or times during the continuance of this contract shall be examined, ascertained and stated in like manner."

The eleventh section, after defining the times when and the terms upon which the plant may be acquired, proceeds as follows:

"And if the (town) shall decide to purchase * * * it shall be at the option of the (town) to do so upon thirty days' notice, * * * and the said party of the second part (the water company) shall * * * well and sufficiently grant, bargain, sell, convey and assign unto the (town) all and singular the water-supply plant aforesaid, together with any extension or extensions thereof to all their real and personal property of every kind whatsoever connected therewith and used therefor and belonging thereto, *including everything taken into account while the cost of the plant was being ascertained as described in sections ninth, tenth and eleventh* upon being paid * * * such sum of money as shall be proved to be the amount of the value of the said water works *on the basis and by the methods* above mentioned."

One has only to read the above-quoted sections to see that the town was careful to provide that the water system should be con-

structed and enlarged in a way that it approved of. To the original contract which it entered into were appended the specifications of the work to be done, and it was thereby provided that the cost of enlargements and extensions, *made with its approval and consent to be manifested by its resolution,* was to be ascertained and stated by its own agents. It was this system so approved that the town was to have the right to acquire on paying the price previously stated and determined. But, as I have already said, it was not upon the acquisition of such a system that a vote was taken. It was upon the acquisition of the system in use.

The agreement provided that the pipe should be of *proper* caliber. Mr. Potts says that pipe from one to three inches in diameter is not of proper caliber. Mr. Van Duyne says that while he was superintendent (1902–1906) the directors did not want to apply to the council in the case of two or three extensions where it was proposed to lay one or two-inch pipes,

"for the reason that they were afraid the council might not give them authority to install them; and advised the consumer making the application to consult with the council and in that way have his request ratified by the council for the installing of it."

The cost of the one or two-inch pipes laid by the company at different times is estimated by Mr. Potts at $15,760.93. This includes those now in use and those which have been paralleled or replaced by four-inch pipe.

If the obsolete pipes, as Mr. Potts calls them, had been authorized by the town council and their cost stated in the manner provided for by the contract, I am inclined to think that the town would have been obliged to pay for them. But, as has been said, they were not. Not only were they not authorized but in some instances at least authorization was not applied for because it was feared that council would refuse permission to lay them. There is nothing in the language of the contract that requires the town to pay for pipes so laid. The contract is that the town shall pay "such sum of money as shall be proved to be the amount of the value of said water works *on the basis and by the methods above mentioned."* If the court requires payment for

those actually used, as a condition precedent to granting the relief of specific performance, it is because it would be inequitable to permit the town to take valuable property without paying for it. But equity does not require that it pay outside of and beyond the contract, for what is valueless; for what it did not approve and might not have approved had its approval been sought. If there is any dispute as to what pipe is still in use a reference may be had.

The question, then, is, What is the cost of the plant in use? No exact determination can now be made. Although the contract specifically provided for the keeping of vouchers, to be followed by an immediate verification of the company's figures, its provisions were in this respect completely ignored, as far as extensions were concerned. The consequence is that we have to rely upon the testimony of experts.

As to the original work there is no dispute except in reference to the Bassett claim, which will be first considered. On August 7th, 1895, a committee of the council reported that the cost was $131,396.20, excluding "bill of C. P. Bassett for extras to be adjusted." A large amount of testimony in reference to this bill, which is said to have amounted to about $20,000, was taken. It is extremely confused and unsatisfactory. Mr. Bassett was one of the contractors. He first intended to construct a pipe line from the dam to the town through a cut, but in the progress of the work he found it would be better to tunnel for a part of the distance. For this and other work claimed to be extra he presented a bill. The water company had a counter-claim against him for delay in completion. A controversy arose which was finally adjusted in this way: Mr. Conover, a director of the water company, on its behalf gave to Mr. Bassett $2,000 in cash and some small houses which, Mr. Bassett testified, he (Bassett) sold for not less than $5,000. Bassett held three hundred shares of the then company, out of a total issue of seven hundred. Of these two hundred were non-assessable and one hundred assessable. Bassett transferred them to Conover and mutual releases were exchanged. Conover, subsequently, transferred these same shares to the water company and the company gave him $3,000 in cash and, as I understand his evidence, which is very confused,

released him and his brother from a liability for assessment on stock which they held. The company had mortgaged its property for $70,000 and owed besides $42,000. This floating debt had to be met, and it was in some unexplained way, in part, at least, paid with money derived from assessment. Bassett not only received the property and money I have mentioned, but, it is said, obtained a benefit, in that he was relieved from this assessment on his partly unpaid shares.

On this statement I think I am justified in remarking that it is utterly impossible to say what sum the company paid for extras. Conover says that in *his* settlement with the company he received in cash and otherwise about $16,000, but the question is not what Conover received but what Bassett got for extra work done. Conover was the company's agent to make the settlement, and he himself could make no profit out of it. Bassett got in money and property at least $7,000, but he gave in return stock that then presumably had *some* value. At this distance of twenty years, no one can tell what that value was or what the real value of Bassett's disputed extra work was, or what substance there was in the company's claim against Bassett for delay in completing his contract. Had the settlement been laid before the town council at the time it was made, it might have been possible to have arrived at an approximation of the cost of the extra work. As it is, it is not possible. If the company suffers it is because it failed to comply with the plain terms of the contract. It definitely appears that the company paid Conover $3,000 to reimburse him in part for what he gave Bassett. That the extra work cost at least this is, I think, reasonably certain. There is too much uncertainty about the net result of the transaction between Conover and Bassett to warrant a further allowance.

I now take up the cost of extensions. For many years the work was done without the approval of the town and, until 1912, no record of its cost was kept by the company. The contract requirement that the cost of the work should be submitted to the town authorities was, as has already been said, not observed. We have two estimates of cost, one submitted by Mr. Potts and Mr. Van Duyne on behalf of the town, and the other submitted

by Mr. Pitney on behalf of the company. The latter is not an engineer's estimate of cost, but a statement based largely upon figures given to Mr. Pitney by the company's employes. He testifies as follows:

"That schedule embodies some estimates of my own, but is made up very largely of the estimated cost of trenching as given to me by others who were familiar with the work."

The others familiar with the work were Mr. Beam, the treasurer, a lawyer by profession, and Michael Hillery, the foreman, under whose immediate direction much of the work was done.

The two estimates differ widely. In order to understand the theory upon which they were made it will be necessary to go into some detail.

The town of Boonton is, according to the evidence, divided into three sections—the Hill section, the Park section and the Flats. The Hill and Park sections contain boulders, that, in the work of digging, require blasting. The Flats section is sandy. Messrs. Potts and Van Duyne estimate the average cost of laying pipe in all three sections as follows: For one-inch pipe, twenty-five cents per lineal foot; for two-inch, forty cents; for four-inch, fifty-five cents, and for six-inch, seventy cents. In this estimate they allow for rock and boulders a uniform or average rate of five cents per lineal foot throughout the entire town. On the other hand, Mr. Pitney, in his statement, gives a special rate for each extension, grounded on statements made to him by Mr. Beam and Mr. Hillery, as to the character of the soil in the particular street. His estimates run from thirty-five cents per lineal foot to $1.05. The witnesses are in substantial accord as to the cost of pipe, which varies from seven cents per lineal foot for one-inch pipe to forty-two cents for six-inch, but they differ as to the cost of wages and the amount of rock (meaning boulder) excavation. If the data given to Mr. Pitney had been correct, undoubtedly his method of arriving at the result would have been the better. But, unfortunately, they are open to serious question. The amount of trenching that can be dug by one man in one day depends upon the character of the soil. Mr. Hillery testified that on the Hill section twenty-five per cent.

of the trenching was earth, twenty-five smaller stone, and fifty per cent. boulder, requiring blasting, and that in the Park section thirty per cent. required blasting. Mr. Potts and Mr. Van Duyne allowed in their estimate for all three sections an average of ten yards of rock excavation for every three hundred feet. Mr. Potts was unfamiliar with the ground, but Mr. Van Duyne had had opportunities for intelligent observation equal to, if not greater, than Mr. Hillery. These estimates were so wide apart that I suggested that trenches should be dug in the Hill section in streets to be selected by Mr. Potts, on the one hand, and Mr. Pitney on the other, for the purpose of ascertaining the fact. This was done and the result was that in six selected streets the average percentage of boulders requiring blasting was only two and seven-tenths per cent., running from nothing to ten per cent. A statement based on information as wide of the mark as that given to Mr. Pitney by Mr. Hillery cannot, of course, be relied upon. The experiment seemed to indicate that the amount of rock allowed in the Potts estimate was at least sufficient. There is, too, a fact, in this connection, which ought not to be overlooked. Mr. Hillery admits that for a considerable period— he cannot state how long—he was willing to, and did, lay pipes extending from curb line to house at twenty cents a foot. The digging was easier than it was in street trenching, for reasons that he gives, but even so, his charge for the work is hardly reconcilable with his present statement as to the character of the soil and the cost of digging.

In the absence of evidence of actual cost we have then nothing but the estimate of two competent engineers; an estimate that is, of course, open to evidence tending to show it to be too low. I am inclined to think that five cents per foot ought to be added to it; that, in other words, thirty cents, instead of twenty-five, should be allowed for one-inch pipe, forty-five cents for two-inch, sixty for four-inch and seventy-five for six-inch. My reasons for this are based upon the actual cost of the Vreeland avenue, the Plane street and the Wilson street extensions, and of the similar work done in the streets of Mountain Lakes, to which may be added the considerations adduced by Mr. Pitney. I do not overlook the fact that lower wages were paid prior to 1911. Mr.

Pitney thinks that the cost of blasting ($1.50) involved in the estimate is too low, and Mr. Van Duyne admits that he would not take a contract for doing the work at the figure given "without limitations." I am impressed with Mr. Pitney's statement that while the estimate might be fair as applied to a large job, done at one time under competent supervision, it fails sufficiently to take into account the fact that the work in question was necessarily done in small sections and under conditions that made it practically impossible to do it in the most economical way. Besides, the test made would seem to indicate that the estimate that one man will on the average throughout the town dig twelve feet of trench in a day is somewhat doubtful as applied to Boonton conditions.

I think that the company is entitled to the actual cost of laying the pipes in Vreeland street, Plane street and Wilson street. These, I believe, are all the streets in which actual cost is shown. The cost of other extensions must be determined by the Potts estimate, as modified. It may be that this estimate, on the whole, falls short of actual cost, but if it does, the company has only itself to blame for its failure to observe the plain terms of the contract.

There was considerable controversy over the taps or service pipes. These are the pipes extending from the mains to the houses. It is admitted that the part of the pipe between the curb and the house has always been paid for by the consumer or owner. It is only the part between the main and the curb that is in dispute. Mr. Van Duyne says that in nearly all cases prior to his time (1902) this was paid for by the consumer. Mr. Beam says that such has also been the practice since 1907. In the intermediate period it was customary for the consumer to pay for the cost of installation and for the company to give him a rebate on his water rent up to such cost. Here, it is obvious, the pipe was, in the end, paid for by the company. Its cost is a part of the cost of the plant. If the company has in any instance paid for taps for which it has not been repaid, their cost is also cost of the plant.